UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

WALL GUY, INC. JEFFREY FRYE AND JR CONTRACTORS,
Plaintiffs,

v.

Case No. 3:20-cv-00304

FEDERAL DEPOSIT INSURANCE CORPORATION, (FDIC) AS
RECEIVER FOR THE FIRST STATE BANK, Defendant.

### MEMORANDUM OF LAW IN OPPOSITION OF THE MOTION OF FDIC-RECEIVER TO AMEND THIS COURT'S JUDGMENT REFLECTING THE STATE COURT'S REMITTITUR ORDER AND GRANT JUDGMENT TO THE FDIC-RECEIVER OR, ALTERNATIVELY. TO ORDER A NEW TRIAL

Comes now the Plaintiffs, The Wall Guy, Inc., Jeffrey Frye, and JR Contractors,  and pursuant to Fed. R. Civ. P. Rule 59(e), and in response and opposition to the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver for The First State Bank ("FDIC-Receiver") prior memorandum in support of its motion to amend the Court's judgment [ECF No. 38] or, alternatively, order a new trial under Fed. R. Civ. P. Rule 59(b).  The judgment was entered after the Court adopted the state court's Order Denying Defendant's Renewed Motion for Judgment as a Matter of Law, Granting, in Part, Defendant's Motion for Remittitur or New Trial, and Denying Plaintiff's Motion to Award Interest on Judgment Pursuant to West Virginia Code 56-6031 ("Remittitur Order"), and after Plaintiffs accepted the remittitur.

This action stems from a breach of contract claims brought by Plaintiffs, The Wall Guy, Inc., Jeffrey Frye, and JR Contractors (collectively, "Borrowers") against The First State Bank ("First State"). Borrowers prevailed at trial and received a jury award of $1.5 million dollars ($1,500,000.00). The Court entered a judgment order on the same and directed post-judgment interest.  After significant delay, the Circuit Court of Cabell County, West Virginia (the "Circuit Court") issued a Remittitur Order, reducing the jury's award from $1.5 million to $524,023.00 in violation of the Plaintiff's 7th Amendment Rights to the US Constitution, and in violation of his rights under the West Virginia Constitution, and in violation of the

1

principles set forth by our founding fathers and several hundred years-worth of jurisprudence. In fact, the average citizen cannot understand how Plaintiffs are not entitled to what was awarded to them in a single line choice on the jury verdict award form following determination of two breaches of contract, and proper instructions from the Court, and even after opposing counsel in closing reminded the jury of the court's instructions as to what they should consider in awarding damages. Borrowers appealed to the Supreme Court of Appeals of West Virginia. First State then cross-appealed. While the appeals were pending, First State failed and the FDIC was appointed as the bank's receiver. This failure was exactly the concern of the Plaintiffs and the reason a pledge agreement, with real property as collateral, was put in place to protect Plaintiffs' award. The FDIC-Receiver then removed the action to this Court, which prevented Plaintiffs from again reaching the "finish line" and receiving an award that has been determined to be justified by a jury, upheld initially in-full and then later reduced by the Circuit Court, but ultimately leaving a partial award. In any event, Plaintiffs have been severely damaged by the Bank and their subsequent receiver by their failure to compensate the now proven damages for a period of approximately 9 years since the two breaches, nearly 3 years since a jury verdict, and nearly a year since the matter was removed to Federal Court, and which arguably may be delayed further by the appeal filed by the FDIC-Receiver at a time when the consolidated cases are not completed in District Court, although, it appears the Court may continue the expected ruling under Federal Rules of Procedure Rule 4(a)(4) or (5).

On March 5, 2021, the Court issued its Memorandum Opinion and Order adopting the Circuit Court's Remittitur Order and directing Borrowers to file a response accepting the remittitur or electing a new trial. No option of appeal was given as in the Remittitur Order which Plaintiffs had previously appealed to the West Virginia State Court when given a similar option in state court. On March 15, 2021, after Borrowers' acceptance of the remittitur, the Court entered judgment. The FDIC-Receiver filed a motion asking the Court to amend that judgment and grant judgment to the FDIC-Receiver or, alternatively, to order a new trial. The Plaintiffs have also requested separate relief to Alter and/or Amend

under Rule 59(e) and have requested that this Court increase their award. Nonetheless, the Plaintiffs now respond in Opposition to the Motion of the FDIC Receiver.

## BACKGROUND

On January 15, 2016, Borrowers filed a complaint in the Circuit Court (CA 16-C-27) asking the court to enjoin First State's foreclosure of real property located at 6157 Booten Creek Road in Barboursville, West Virginia ("Booten Creek"), and asserting three causes of action; **breach of fiduciary duty, negligence, and breach of contract** ("Complaint"). (Def. Ex. A), Complaint [ECF No. 6, PID 50]. Plaintiffs also tried to amend their complaint to include the "pat on the back" from the First State Vice President, Andrew Vallandingham, who testified at trial; however, their motion to amend was denied. Plaintiffs had a long-standing trust history with this Bank which would explain why he would have trusted the Bank in signing over in excess of over $873,000.00 worth of collateral on previously unsecured loans (which actually totaled far less than the amount on the face of the loans (approx. $385,000, not 510,000.00). **(See Pl. Exhibit A – Jeff Frye's Affidavit)**. Plaintiffs have stated they needed this "free and clear' collateral in order to post bonds for large scale State project work. Plaintiffs trusted Mr. Andrew. Vallandingham, First State Vice-President (who took over from the infamous Jackie Cantley) when he said the Bank would provide for the bonding as needed. It is interesting to note that Plaintiffs actually only received approximately $30,000.00 for signing over nearly $873,000 worth of collateral. It is unfathomable that, at a time when the First State Bank was being monitored by the "FDIC" , and wherein the First State Vice-President, Andrew Vallandingham, testified in court to the fact the Bank had the loans reviewed several times, including by the FDIC themselves, that the FDIC-Receiver can now refuse to compensate the Plaintiffs for their damages as determined by the jury, and even at a minimum as determined by the Circuit Court and now the District Court of the Southern West Virginia.

 **(See Pl. Exhibit B - testimony at trial from Andrew Vallandingham, Vice President).**

During the trial, the Bank stipulated there were two contracts involved herein.(**See Pl. Exhibit C**) trial transcript regarding stipulations).  So again, it is unfathomable that the FDIC-Receiver is even attempting to argue there are no contracts between the Plaintiff and First State.  Further, this Court can take judicial notice that the same was recorded in *Bonds, Contracts, and Leases* records at the Cabell County Court House, also in various Trust Deeds, in addition to the stipulation at trial (**See Pl. Exhibit C**).

It is unclear from the record whether the Circuit Court denied Borrowers' request for injunctive relief or simply failed to act on it.  While the FDIC is unsure, Plaintiffs remember the day that everything they owned, whether personally, through a business, or otherwise, was taken from them.  In any event, the *foreclosure* proceeded and First State acquired title to Booten Creek, which it later pledged, along with other unrelated properties, to Borrowers in lieu of an appellate bond.  (Def Ex. C, Pledge Agreement [ECF No. 24-4])

On May 13, 2016, First State commenced a separate action, civil action no. 16-C-341, to address Borrowers' interference with the bank's efforts to repossess collateral securing Borrowers' obligations and ultimately, to recover damages.  The second case has always been objected to by Plaintiffs as it should have been a compulsory counterclaim under Rule 13(a) of the West Virginia Rules of Civil Procedure. The cases 16-C-027 and 16-C-341 should have always been consolidated, In fact, counsel was so concerned about this issue that the entirety of 16-C-341 was included as an exhibit in the trial of 16-C-027, and acknowledged.  Further, this Court has correctly consolidated the remnants of both cases in their entirety and now Plaintiffs and Defendant may finally receive justice.

After the court issued the May 2016 Order, all action on First State's complaint ceased, although all property listed on **Pl. Exhibit D** –(Bankruptcy agreed order with corresponding valuations) was removed/seized from Plaintiffs, including the private home of Jeffrey Frye, his Booten Creek business property, vehicles, dump trucks, valuable work vehicles, etc., all totaling over $873,477.00 (**See attached Pl. Exhibit D** – Bankruptcy Court Agreed Order (which was agreed to by the Bank in question through

their attorneys). These valuations also match Bank's prior exhibits which were the Banks' own valuations of the same by their loan officer in prior filings. Proceedings continued on Borrowers' Complaint, which asserted, among other things, that the "infamous Jackie Cantley ...added amounts to the loans that Mr. Frye or his businesses never received." The lack of proper funding was later proven to the jury, including two separate loans being declared as breached by the Bank. Said breaches occurred immediately and in some instance by misconduct, even before the signing of the same, but ultimately were so severely breached such that Plaintiffs ended up paying more after essentially the " loan consolidation" on a monthly basis, which converted approximately $385,000.00 worth of debt to over-secured and over-collateralized debt, placed Plaintiffs in an impossible position because the Bank later failed to provide the "promised bonding" when needed so that Plaintiffs could perform necessary work, etc.

On August 4, 2018, Borrowers filed a motion to set aside the May 2016 Order. West Virginia Rule 60(b)., Order [Case No. 3:20-cv-00305; ECF No. 12]. Addressing a motion in limine filed by the Bank, the court ruled that its findings in the May 2016 Order collaterally estopped Borrowers' claims relating to the Bank's security interests, including claims of wrongful foreclosure or repossession, and therefore barred evidence of wrongful foreclosure or repossession and any damages arising from the Bank's lien enforcement.. Order [ECF No. 6-4, PID 584. It is noted that at all times the Plaintiffs always referred to the repossessions as "lawful" and never once violated the Order of the Circuit Court, either on the underlying action or the motion in limine. **See Pl. Exhibit E** (Testimony Trial Transcript page 161 -- 1 through 12). It is interesting to note that the Defendant Bank did not comply with the disclosure directives of the same Circuit Court until March of 2017, long after the entry of the above Order. Further, the said finally-delivered discovery was a jumbled mess of 1571 pages, all given in a disjointed and difficult to understand electronic file (in no particular order) that took more than 8 months to decipher the same and determine the amount of funds that were ultimately not provided to Plaintiffs. Thus, essentially preventing Plaintiffs from properly challenging the same except under standards such as manifest injustice through

Rule 59(e), which Plaintiffs are now requesting by separate motion.

Shortly before trial, the court granted partial summary judgment to First State, ruling that Borrowers had failed to produce evidence of a "special relationship" to support the existence of fiduciary or other extra-contractual duties requisite to Borrowers' tort claims. Order [ECF No. 6-5, PID 612], The court declined, however, to grant summary judgment on Borrowers' breach of contract claim. *Id.* However, the Court did allow the same to go to the jury. A three-day jury trial ensued, beginning on August 21, 2018. Borrowers presented four witnesses; Mr. Frye, Andrew Vallandingham (First State's senior vice president), Teresa Rayburn (a First State employee), and J.D. Koontz (an expert witness retained by Borrowers). In its defense, First State relied on the testimony of Mr. Vallandingham and Ms. Rayburn.

The FDIC-Receiver indicates in their footnote #3, that the indictment in 13-cr-00245 (involving Jackie Cantley) does not include any of the borrowers loans; however, the same does include the initials JF  (which Plaintiffs allege appears to be Jeffery Frye – **See Pl. Exhibit F** – Indictment of Jackie Cantley and specifically Count One 2(f). Cantley was indicted on MULTIPLE charges, but ultimately pleaded to one count of misapplication of bank funds on February 19, 2014, and was sentenced to a 60 month prison sentence and fine. Cantley was the primary loan officer involved with the majority of Plaintiffs' loans. Nonetheless, the two consolidation loans herein, that were breached, were ultimately "cleaned up" by the Vice President Andrew Vallandingham - Andrew Vallandingham testimony at trial).

Mr. Frye testified in support of Borrowers' breach of contract claim. The Plaintiffs' expert witness, J.D. Koontz, also testified at trial and discussed the same, the crux of his testimony was that former First State employee Jackie Cantley booked $125,000 in loan advances that were "missing." *See, e.g.,* Def Ex. B, Trial Transcript, p. 129, lines 13- 20, p. 132, Lines 19-22 [ECF No. 7-3, PID 1026]; Def Ex. B, Trial Transcript, p. 164, lines 1-4 [ECF No. 7-3, PID 1034]; Def Ex. J, Pls. Exh. 12.

Borrowers' expert, J.D. Koontz testified,.. "Mr. Frye ... made payments on loans that he didn't receive the full benefit of, and then, at some point, he had collateral repossessed and, *as a result of the*

*repossession,* was unable to go out and do work, which hurt his business." Def Ex. B, -Trial Transcript, p. 365, lines 2-8 [ECF No. 705, PID 1106] (emphasis added).   Mr. Frye and Mr. Koontz identified significant sums of missing loan proceeds, but the fact is these crippled his business when combined with the increased monthly payment schedule, which Plaintiffs received little to no benefit for.

First State's witnesses testified and admitted that the Consolidation Loan failed to advance over $ 5,000 to Borrowers, either through payoffs of prior loans or disbursements to Borrowers. Def Ex. B, Trial Transcript, p. 301, lines 12-14 [ECF No. 7-4, PID 1090]; p. 554, lines 1-21 [ECF No. 7-5, PID 1179]. In addition,   Andrew Vallandingham testified that the was paid to other clients' accounts,   Pg 287 of transcript, pages 9-21.  It has since been determined that the amount placed upon the *Elmo* screen at trial, namely the $54,748.31, was not included in the loan Trial transcript (See Pl. Exhibit G)  pg 258, line 24 and page 259 lines 1 to 4.  First of all, the above loan amount was never disclosed in discovery. Secondly, when this discovery was unsuccessfully attempted to be presented at trial by the Bank, the Bank was  given additional time, in recesses, to go find the same.  Ultimately, at this 11th hour in mid-trial, and after having had years to produce the same, the Bank could still not produce any supporting discovery documentation.  See **Pl. Exhibit H–** Trial transcript info regarding the same.  Clearly, funds were missing here, and the facts as well, documented that Plaintiffs never had significant funds, additionally, the Bank had no evidence to support many large alleged disbursements to Plaintiffs.  Even though the Bank had a criminal as the loan officer, the other Bank officials continued to work off of these improper loans and further crippled Plaintiffs by their conduct, which was clearly designed to protect a failing Bank, and which was all the while under the supposed watchful eye of the FDIC (**See prior Pl. Exhibit B** -transcript wherein Vice President Andrew Vallandingham clearly testifies to loan reviews done by the board, as well as **The FDIC** itself!). It is interesting to note the Plaintiff should have already been compensated during the claims process required by law, which actually caused this case to be stayed

while the same was conducted, wherein the FDIC again failed to properly compensate Plaintiffs, which has caused additional delays all because the FDIC-Receiver has not reviewed its own records and acknowledged the claim should be paid in its entirety.

While the FDIC attacks current Plaintiffs counsel's closing at trial, wherein counsel stated that if you(the jury) find that a "big number is $300,000 or you think a big number is $500,000 ...., they are still coming after him for these judgments. First of all, this is closing, It is not evidence. Secondly, IT WAS NOT OBJECTED TO at trial. Thirdly, and possibly most importantly, this fact is still true... the Bank and now FDIC-Receiver have continued to try to claim the Plaintiffs owe them money, even in light of the jury verdict and the Court's rulings. Counsel's statement couldn't be any more true! The Bank also knew this to be true as well, or they would have objected. The jury was properly advised as to how to determine damages. There is no evidence to show that they considered anything whatsoever improper in the award when filling in the one line verdict form, which was as previously proposed by the Bank. Invading the sanctity of that jury room where deliberations occurred violates Plaintiffs 7th Amendment US constitutional rights and other constitutional rights, and is an INDICTMENT of our founding fathers' brilliantly developed civil jurisprudence and civil jury system. I find it very difficult to explain this case to any member of society as they cannot understand why these jurors ... missed work, attended hearings for days fulfilling their civil duty, only to have their final verdict ignored as herein.

First State moved for judgment notwithstanding the verdict, arguing that Borrowers' default barred their breach of contract claim under long-standing West Virginia law, and requested, alternatively, remittitur or a new trial due to the excessive and unsupported damages award[1] Def Ex. N, [ECF No. 6-5, PID 667].

In the Remittitur Order, issued on March 14, 2019, the court denied First State's request for

---

[1]    First State also argued that Borrowers' execution of the agreements pertaining to the Consolidation Loan and the SBA Loan constituted a novation. The Circuit Court rejected the argument, finding that there was no explicit novation. The FDIC-Receiver has stated that it does not intend to challenge that finding in their motion.

judgment because, according to the court, "the evidence presented at trial showed that Plaintiffs' default or breach occurred *after* Defendant's breach and Plaintiffs' damages accrued." Def Ex. O, Order [ECF No. 7-1, PID 830]. The Circuit Court offered Borrowers the opportunity to accept the reduced judgment amount, request a new trial, or appeal. *Id.* But the Circuit Court offered one more option than the District Court had offered Plaintiffs. An appeal is readily at hand based upon Defendant's filing of an appeal to the 4th Circuit before the District Court had even completed the rulings on the consolidated cases as discussed in the Memorandum Opinion and Order [ECF 34]. Plaintiffs had accepted the Order believing the Court would ultimately provide justice in the companion case by awarding the $ 873,477.00 in property which was never awarded back to Plaintiffs in either the jury verdict or the remittitur.

Borrowers elected to appeal the Circuit Order and First State cross-appealed. The West Virginia Supreme Court had not yet heard the parties' oral arguments or other arguments when First State failed. The FDIC-Receiver then removed the matter to this Court, which adopted the Remittitur Order, with a modification requiring Borrowers to accept the remittitur or elect a new trial. At the same time, the Court denied, presumably as premature, a motion for summary judgment filed by Borrowers and a motion to reconsider and amend filed by FDIC-Receiver. On March 8, 2021, Borrowers accepted the remittitur and the Court then entered judgment. FDIC-Receiver appealed to the 4th Circuit Court of Appeals and Borrower has also had to appeal to protect their interests, based upon Appeal by FDIC-Receiver. , However, fortunately, so far it appears from the filings that the Court will continue and make a ruling on additional issues, including, but not limited to, cross motions for 59(e) relief from both sides.

## SUMMARY

As Fourth Circuit precedent makes clear, a district court should consider post-judgment motions, applying federal standards of review, following its adoption of a state court's final order in a removed matter. *See Resolution Tr. Corp.* v. *Allen,* 16 F.3d 568, 573 (4th Cir. 1994) (After adoption by the district

court, "the judgment would be treated the same as other judgments entered by the district court and the parties would follow the ordinary rules regarding post-judgment remedies."). Thus, the Court's judgment reflecting the adopted remittitur order is subject to a Rule 59 motion for a new trial or a motion to alter or amend like any other judgment.

It is undisputed that the trial in the Circuit Court was errorless and further the same included a jury verdict that should have been unquestioned…solid as a rock. In fact, the jury was properly instructed by both the Circuit Court's instructions as well as re-explained by the Bank's counsel during closing as to how to determine damages (**See Pl. Exhibit I**).

After the state court issued its final order, the FDIC was appointed as First State's receiver. That appointment and the removal to this Court brings into play the federal rules. The Bank raises issues under federal law, under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), issues including, specifically, 12 U.S.C. §§ 1823(e) and 1821(d)(9)(A), precluding claims based on purported agreements that fail to meet four categorical recording requirements, and 12 U.S.C. § 1825(b), barring punitive damages. HOWEVER, ALL 4 CATEGORICAL REQUIREMENTS WERE MET HEREIN, AND FURTHER, THE FDIC IS INTIMATELY AWARE OF THE SAME; HENCE SAID ARGUMENT IS IMPROPER AND IT IS CONTRADICTED BY THE TRIAL TESTIMONY, EXHIBITS ON RECORD AT THE CABELL COURTHOUSE, AND CONTRARY TO ALL EVIDENCE WHICH WAS REVIEWED BY THE FDIC (See Vallandingham Testimony – **See prior Pl. Exhibit B**).

The Defendant improperly challenges that there is no contract. Not true as the same is contrary to the evidence stipulated at trial. (**See prior Pl. Exhibit C** -Trial transcript regarding stipulation). The Defendant refers to loan 0625 which was excluded by the Circuit Court for the reason it was never produced in discovery, even when given the trial court's 11th hour extension in mid-trial to further attempt to provide any documentation, the Bank wholly failed to produce any such evidence, thus the same was properly excluded by the Circuit Court. (**See prior Pl. Exhibit H**)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment within 28 days following entry of judgment. F.R.Civ.P. 59(e). As the Supreme Court recently noted, "Rule 59(e) derives from a common-law court's plenary power to revise its judgment... before anyone could appeal." Banister v. Davis. 140 S.Ct. 1698, 1709 (2020).

The Fourth Circuit has announced three grounds for amending an earlier judgment when a party brings a motion under Rule 59(e): "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice" Pac. Ins. Co. v. Am. Nat. Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (citation omitted). Review under Rule 59(e) also allows the court "to consider any new federal questions injected into the case by the addition of [a federal agency acting as a receiver under FIRREA]." Allen, supra, at 573.

Similarly, Rule 59(b) allows a party to file a motion for new trial within 28 days after entry of judgment. The unusual procedural posture of this matter, in which the Court has granted judgment pursuant to its adoption of the state court's Remittitur Order, does not alter the FDIC-Receiver's right to seek a new trial under Rule 59(b) because, as Allen makes clear, an action in which the FDIC is a party is deemed to arise under the laws of the United States. See Allen, supra, at 575; Lindley v. FDIC, 733 F.3d 1043, 1056 (11th Cir. 2013) (citing 12 U.S.C. § 1819(b)(2)(A).[2]

The law appears clear at the Federal Level and the jury verdict and subsequent judgment order should be followed in this matter, because of the following: "This Court may reverse a jury verdict only when there is a complete absence of probative facts to support the conclusions reached by the jury. Sherrill White Constr., Inc. v. South Carolina Nat'l Bank, 713 F.2d 1047,1050 (4th Cir.1983). This verdict must stand if, taking the evidence in the light most favorable to [Plaintiff], there is "any substantial

---

[2] 12 U.S.C. § 1819(b)(2)(A) states that, subject to certain exceptions (not applicable here): "all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States." Allen involved the Resolution Trust Corporation ("RTC"), a federal agency established under FIRREA in the wake of the savings and loan crisis. A similar provision cited by Allen, 12 U.S.C.A. § 1441 a(l)(1), governed actions to which RTC was a party.

evidence" to support it. See *Vodrey v. Golden,* 864 F.2d 28, 30 n. 4 (4th Cir.1988). "Substantial evidence" is such evidence as a reasonable mind might accept as adequate to support the conclusion even if different conclusions also might be supported by the evidence. *Gibralter Sav. v. LDBrinkman Corp.,* 860 F.2d 1275,1297 (5th Cir.1988), cert, denied, 490 U.S. 1091 (1989). See *Parris v. Lynch,* 35 F.3d 556 (4th Cir. 1994).

In addition to the Federal Law on the subject cited above, West Virginia State Law also supports the same logical conclusion. The lower court should have drawn every inference in favor of the Plaintiffs and had no authority to assume or guess how the jury arrived at the amount of damages. "In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true. Point 3, Syllabus, Walker v. Monongahela Power Company, 147 W.Va. 825,131 S.E.2d 736 (1963)." *Syl.* Pt. 2, Coxv. Gallagher Motor Sales Co., 158 W.Va. 685,213 S.E.2d 475 (1975). Roberts v. Stevens Clinic Hosp., Inc., 345 S.E.2d 791,176 W.Va. 492 (W. Va., 1986)." Plaintiffs acknowledge that the Court cannot generally set aside a jury verdict upon the claims that it is excessive unless the verdict is monstrous and enormous, at first blush beyond all measure, unreasonable or outrageous, and as such manifestly shows jury passion, partiality, prejudice, or corruption." Roberts v. Stevens Clinic Hosp., 345 S.E. 2d 791(W.Va.1986).  This case actually relates back to the basics in the law, "'Where the facts are in dispute, and the evidence in relation to them is that from which fair minded men may draw different inferences,' the case should go to the jury" (quoting Washington & G.R. Co. v. McDade, 135 U.S. 554, 572,10 S.Ct. 1044, 34 L.Ed. 235(1890)))." Sloas *v. CSX Transp.,*616 F.3d 380 (4th Cir. 2010).

## ARGUMENT

I.  **Reconsideration and amendment of the Circuit Court's judgment to reduce the Judgment does not apply because errors of law do not apply under FIRREA through Federal Law**

Reconsideration under Rule 59(e) "permits a district court to correct its own errors, 'sparing the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Pac. Ins. Co., supra,* at 403. The FDIC-Receiver's request to reduce the Judgement is fundamentally flawed. For the FDIC-Receiver to even attempt to argue the same indicates the FDIC-Receiver has either failed to review their own records, the trial transcript, as well as well as the plethora of records recorded by the Bank for which they now "stand in the shoes of".

Here, when the FDIC operated as receiver, it stepped "into the shoes" of the bank. *FDIC v. Glickman,* 450 F.2d 416,418 (9th Cir.1971) *F.D.I.C. v. Wheat,* 970 F.2d 12 (5th Cir. 1992).

### Ia. The Circuit Court's denial of First State's motion for judgment notwithstanding, the verdict correctly applied West Virginia law.

First State's Renewed Motion for JNOV, citing *Jones* v. *Kessler,* 126 S.E. 344 (W. Va. 1925), *incorrectly* argued that Borrowers, whose default was confirmed by the May 2016 Order, could not maintain an action for an alleged breach of a contract that they themselves had previously breached. The argument made by the FDIC-Receiver is fundamentally flawed for a multitude of reasons. The Bank's dual breaches occurred just prior to and during the signing of both loan documents/contracts. The Bank further nearly doubled Plaintiffs' monthly payments on a loan consolidation wherein the Plaintiffs received little value, and further signed over $873,477,00 in collateral. In considering the issues behind why these contracts were generated, which were hidden from and were never presented to the jury, the issues were: 1) the loan officer went to Federal prison for loan mismanagement. 2) the indictment for the loan officer included the Plaintiffs initials in regards to a loan. 3) the Bank promised Plaintiffs bonding "with a pat on the back" acknowledgment after nearly 15 years of trusted banking service [hence the Bank assured Plaintiff he would not need to keep his collateral free and clear because the bank would "Bond" him or vouch for bonding in regards to funding for significant and lucrative State construction jobs. 4) the implied issue that consolidated loans lowers one's payments and provides significant additional

capital,  neither of which occurred.

Nonetheless, Plaintiffs are satisfied with the jury verdict, plus the return of $873,477.00 in the companion case, or the jury verdict alone, or even potentially the remittitur verdict provided the $873,477.00 as well as other increases to the judgment as warranted, assuming the same is reimbursed through the consolidated case 20-cv-0305, depending upon the analysis.  A new trial is not an option because the bank is now closed, witnesses are unavailable from the Bank, etc.  So essentially Plaintiffs need to be satisfied with what was awarded in the context it was presented.

Under West Virginia law, a plaintiff suing for breach must "show that he has complied with the contract himself, and, if the evidence shows that he did not or has not complied with the terms of the contract, and has not been prevented or relieved therefrom as aforesaid, he will be denied a recovery from the breach of same." *Charleston Nat'l Bank* v. *Sims,* 70 S.E.2d 809, 813 (W. Va. 1952) *{quoting Jones* v. *Kessler, supra)', Milner Hotels, Inc.* v. *Norfolk & Western Ry. Co.,* 822 F.Supp. 341, (S.D. W.Va. 1993) (same), *aff'd,* 19 F.3d 1429 (4th Cir. 1994); *see, also, Fifth Third Bank* v. *McClure Properties, Inc.,* 724 F.Supp.2d 598, 602 (S.D. W.Va. 2010) ("One claiming rights under a contract must be able to show that he has performed his duties thereunder.").  Clearly, Plaintiffs fully complied with the terms of the contract until Plaintiffs were prevented or relieved therefrom.  And In fact, even though the Bank thrust Plaintiffs into Bankruptcy.   Jeffrey Frye and Jr Contractors paid an additional amount of over $56,000.00 to the bankruptcy trustees  to disburse funds accordingly after the Bank forced him Jeffrey Frye and JR Contractors into "Bankruptcy in 2014.  The Wall Guy, Inc., however, *never* filed Bankruptcy.  The loans 1825 & 7071,  both which were breached by First State, originated December 13, 2012 – although the Bank secretly made payments on the SBA loan between July and December 13th, 2012,  the date when Plaintiffs and Defendant Bank entered a contract.  It is interesting to note that while only Jeffrey Frye and Jr Contractors filed Bankruptcy,   the Court however also considered the value of all collateral, including Jeffrey Frye, JR Contractors, *and The Wall Guy, In*c.  Importantly, when Jeffrey Frye filed bankruptcy

affidavits information about the value of the collateral, *he did not include property owned by The Wall Guy, Inc.* (which was the majority of the collateral held and later taken by the Bank.  So when the Bank constantly brings up the affidavit  and argues a much lower value of the collateral, they are **misstating the facts**.  The correct amount of compensation should also include ALL property seized from the Wall Guy, Inc., which is the vast majority of the property (over $650,000.00).

It is undisputed that Plaintiffs fully complied with the loans/contracts for an extended period of time.   Additional payments were made on the loans, even after consolidation. However, the bank breached both loans at a point no later than the execution and recording of the same.  In fact, the bank recorded the exhibits literally hours after the loan execution.   In hindsight, this Court can clearly see the Bank was purposely trying to protect their interest in "cleaning up" the mess created by the criminal conduct of their loan officer and had no concern for Plaintiffs' rights or property.  Specifically, the Bank knew, or should have known, the loans were grossly underfunded, knew they were taking over $300,000 in unsecured debt and converting it to over-secured and over-collateralized debt, thus were setting Plaintiffs up for failure as they were nearly doubling his monthly payment, removing his ability to receive bonding, and they had no intent to bond Plaintiffs.  So, to be clear, at the time that Defendants breached both contracts, the Plaintiffs were in full compliance with their loans and had not breached.  Further, the "*doctrine of unclean hands*" should protect the Plaintiffs from the Defendant's misconduct.   The Defendants essentially set Plaintiffs up to fail which did not occur until shortly before the Bankruptcy was filed.

The Circuit Court properly found that Borrowers' breach of contract claim was not barred because, according to the court, the evidence showed that First State breached first. The timing of the breaches is not disputed since they grossly underfunded the loans  from their very inception. And further, never dispersed the required amounts.  The Bank has clearly admitted their "breach" with its mistaken inclusion of a  $5,175.00  SBA loan origination fee in the Consolidation Loan balance.  The Bank has

been aware of this portion of the underfunding.  Further, the Bank is well aware of the additional underfunding in excess of $125,000.00, and the catastrophic effect the same would have had, Instead of receiving a boost of money from the inception of the loans, Plaintiffs encountered a significantly diminished cash position insufficient to perform business for which the loans were intended, plus coupled with nearly double monthly payments, …*and a loss of $873,477.00 worth of collateral.*

Defendant claims, the lack of evidence impermissibly left the jury to speculate on the Bank's breaches and the actual damages, if any, sustained by Borrowers. *See Primoff* v. *Warfield,* 495 F. Appx. 293 (4th Cir. 2012) (unpublished); *Neptune Equities, Inc.* v. *Bearden Oil Co.,* 275 F. Appx. 824, 826 (11th Cir. 2008) (unpublished) ("The jury cannot be left to speculation, conjecture, and guesswork" in deciding on a breach or the damages arising from the alleged breach.); *see, also, Ford Motor Company* v. *McDavid,* 259 F.2d 261, 266 (4th Cir. 1958) cert, denied 358 U.S. 908 ("...it is the duty of the court to withdraw the case from the jury when [a] necessary inference is so tenuous that it rests merely upon speculation and conjecture.").

The claim of the jury "speculating" is completely unfounded.  In fact, the Court properly instructed the jury in regards to speculation.  (**See Pl. Exhibit M**)   Further, the Bank's counsel reminded the jury of the Court's directions just before jury retired to the jury room. (**See Pl. Exhibit N**)   The only speculation herein is what non-jurors may speculate or claim what occurred in the jury's deliberations which is not permitted in the law and a constitutionally protected right of the Plaintiffs.

"Laycock acknowledges the irreparable-harm requirement, and he argues the trial court's order will cause that harm "by needlessly extending litigation in this matter, exploring the subjective motives of jurors, and invading the privacy of the jury deliberation room." Pet. at 11; accord id. at 30–31 (explaining that "litigation would be extended in this matter without legal justification, the sanctity of the jury room would be violated, decades of jurisprudence and public policy would be eroded, and jurors would be unnecessarily harassed"). These harms, even if demonstrated, cannot provide a basis for our jurisdiction.

16

*Laycock v. TMS Logistics, Inc.,* 209 So. 3d 627 (Fla. App. 2017).

In this case, the Defendant asks this Court to invade the sanctity of the jury deliberation room and guess or speculate as to what was considered in damages for a one line verdict form. Both the Court and the Bank's counsel advised the jury not to speculate. Further, the Banks's attorney reminded the jury of the same, without objection. Remittitur herein for the above, based upon a guess or speculation, "needlessly extends litigation in this matter, exploring the subjective motives of jurors, and invading the privacy of the jury deliberation room in violation of the jurors constitutional rights as well as Plaintiffs constitutional rights. By speculating on these issues, as requested by the Defendant, violates decades of jurisprudence and public policy.

Failing to actually lend the funds promised in loan contracts is a *per se* breach of contract. Defendant knows, and the Bank even admitted to a portion of the breach. In addition, Plaintiffs successfully proved an amount in excess of $125,000.00 of undispersed funding for the loans/contracts. Defendant states the loans were neither promised nor requested. This statement is fatally flawed,

**(See prior Pl. Exhibit I)**

**Ib. Borrowers' claims are not barred by 12 U.S.C. §§ 1823(e) and 1821(d)(9) for multiple reasons as FIRREA is a "comprehensive statutory scheme granting the FDIC authority to act as Receiver for a failed financial institution and special powers to carry out that function." Kramer v. FDIC, No. Civ.A. 1:08-1430, 2009 WL 4675796, at *1 (S.D.W. Va. Dec. 9, 2009).**

The statute also "sets forth a detailed series of rules under which all claims involving an insolvent institution are received and handled." *Brady Development Co., Inc.* v. *RTC,* 14 F.3d 998,1002 (4th Cir. 1994).

As applicable here, FIRREA precludes claims that are based on agreements which tend to

diminish or defeat the interest of the FDIC in an asset it has acquired unless the agreement:

    (1)   is in writing,

    (2)   was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

    (3)   was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

    (4)   has been, continuously, from the time of its execution, an official record of the depository institution.

*Allen, supra,* at 574, citing 12 U.S.C. § 1823(e). "All four of these requirements must be satisfied for an agreement to be enforceable against [FDIC]." *Id.* And, under 12 U.S.C. § 1821(d)(9) "an agreement that does not satisfy § 1823(e) cannot be the basis of a claim against a receiver of a failed financial institution." *Id.*

Defendant's argument that the FIRREA precludes the claims herein is absolutely baseless. Plaintiffs can prove that all 4 requirements above clearly apply to /are satisfied in this case, and provides the following supporting arguments:

    at the time of trial (See Pl. Exhibit I)  Further both loan/contracts in their entirety were admitted into evidence:

    **(1a)**  The contract agreement herein is in writing, It was stipulated as a contract. In addition, the Bank recorded these in Bonds, Contracts and Leases Records section at the Cabell County Courthouse.  Further, additional documents relying

.

on the written contract were recorded at the Cabell County Courthouse. **(See prior Pl. Exhibits B and C)**

**(2a)** The contract was executed by the depository institution as well as Jeffrey Frye. **(See prior Pl. Exhibits B and C)**

**(3a)** The same was approved by the board of directors, the loan committee, and multiple members of the Bank **(See prior Pl. Exhibits B and C )**

**(4a)** Record has been continuously, from the time of execution, an official record of the depository institution. These records are, in fact, still recorded at the Cabell County, West Virginia Courthouse.


In addition to the fact that all 4 requirements above are entirely met, the FDIC Receiver conveniently omitted paragraph (2) of U.S.C. 1823 (e) (2) EXEMPTIONS FORM CONTEMPORANEOUS EXECUTION REQUIREMENT, which states, "An Agreement to provide for the lawful collateralization of deposits of, or other credit extended by, a Federal, state, or local governmental entity, or any depositor referred in section 1821(a)(2) of the title, including an agreement to provide collateral in  lieu of surety bond. *This exemption fully exempts Plaintiffs from the attack made under FIRREA against Plaintiffs by Defendant.*  Further, Plaintiffs are TWICE insulated under this provision, in light of the collateralization of the original agreement, and further in regards to the written pledge agreement which the FDIC-Receiver now acknowledges was posted in part in lieu of posting a cash bond for surety pending the Plaintiffs' appeal to the West Virginia Supreme Court. The agreement to provide collateral in lieu of a surety bond clearly insulates and protects Plaintiffs under this exemption.

## II. THE DEFENDANT'S ARGUEMNTS FOR A NEW TRIAL LACKS ANY MERIT

For the reasons discussed above, this dispute went to trial as with *David battling Goliath*. Nearly

every possible theory of recovery had been stripped by the Pre-Trial rulings, and based thereon David with one arm tied behind his back was able to slay Goliath.  A proper jury award was issued.  A new trial might normally be beneficial to Plaintiffs as additional claims could have been restored including *breach of express warranty, breach of fiduciary duty, negligence as well as two breaches of contract.* Further, this may permit Plaintiffs to even recover punitive damages.  However, a new trial is not warranted, The fight is over ...and David has slain Goliath.  To resurrect Goliath and to allow a second fight would be a travesty of justice.  Further, and equally important, a new trial is an  Impossibility.  The Bank is long since closed.  The witnesses necessary for the trial are unavailable.  The trial was essentially errorless.   It has been nearly 3 years since the trial and Plaintiffs have not been awarded one cent despite receiving a $1,500,000.00 jury verdict,   To essentially start over from scratch when Plaintiffs have to bear their own attorney fees and costs makes no sense and would only make a mockery of justice.    Plaintiffs, and their nearly 12 employees at the time, and the small law office that has represented them since 2017 before the trial, have all been awaiting the final collectable judgment in this case.   To further delay this after waiting nearly 3 years would  again  be a major travesty of justice.

Mr. Frye had, in fact, previously filed in the same bankruptcy case, a Chapter 13 repayment plan signed under penalty of perjury, estimating that First State's collateral was worth only $217,400. *Id.* [ECF No. 90].  This was absolutely true and still true today.  However, the Defendant continues their improper smoke and mirrors attacks on Plaintiffs and in misstating the facts.  There are more Plaintiffs members than just Jeff Frye...i.e. The Wall Guy, Inc.  The value of the subject collateral in this case was determined by:

      1) the   Bankruptcy Court in approving the agreed order, was also agreed to by the Bank.

      2) and   was independently produced from the Bank's disclosure where the loan officer
          valued the collateral for the loans, the majority of which was actually property owned
          by The Wall Guy, Inc.,...who was not part of this Chapter 13 bankruptcy case.

Therefore, Jeff Frye can rightfully value his offered collateral property at $ 217,400, excluding The Wall Guy Inc. property which had the majority share of the Property (in excess of $650,000.00 worth in addition to the above).

The Court should deny the motion under 59(e) as filed by the Defendant and further deny any new trial because the same is not warranted under existing law or even under a motion to modify existing law (and the same would be an  impossibility at this point as well).

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny Defendants Motion to Alter and Reconsider and amend the Circuit Court's Remittitur Order and deny their Fed. R. Civ. P. Rule 59(b), or other motions, except to the extent the Court alters or amends such that the amount of Judgement be increased herein or in Plaintiffs previously filed motion.

**Steven T. Cook**
**of Cook Law Offices, PLLC**
**Counsel for The Wall Guy Inc., Jeffrey Frye, and JR Contractors, Plaintiffs**
**PO Box 549**
**Barboursville, WV 25504 Phone 304-521-1304 Fax 304-521-1534**

·

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF WEST VIRGINIA**

**THE WALL GUY, INC. JEFFREY FRYE AND JR CONTRACTORS,**
**Plaintiffs,**

**v.**

                                                              **Case No. 3:20-cv-00304**

**FEDERAL DEPOSIT INSURANCE CORPORATION, (FDIC) AS
RECEIVER FOR THE FIRST STATE BANK, Defendant.**

**CERTIFICATE OF SERVICE FOR
PLAINTIFFS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
PURSUANT TO FEDERAL RULES
OF CIVIL PROCEDURE
RULE 59(e) TO ALTER/AMEND THE COURT'S JUDGMENT, ETC.**

**Counsel swears he served a copy of the above document by pacer e-filing on the 19th day of April, 2021 to:**

**BAILEY & GLASSER LLP**
**Benjamin L. Bailey (WVSB #200)**
**Raymond S. Franks II (WVSB #6523)**
**Christopher D. Smith (WVSB #13050)**
**209 Capitol Street Charleston, WV 25301 (304) 345-6555 (Telephone)**
**(304) 342-1110 (Facsimile) bbailey@baileyglasser.com, rfranks@bailevglasser.com, csmith@baileyglasser.com**

**FEDERAL DEPOSIT INSURANCE CORPORATION LEGAL DIVISION**
**B. Amon James, Senior Counsel**
**Nicholas Katsonis, Counsel**
**3501 Fairfax Drive, Room VS-D-7066**
**Arlingtoh, Virginia 22226**
**(703) 562-2089**
**baiames@fdic.gov**
**nkatsonis@fdic.gov**

**Sworn by Steven T. Cook , Esq.** _Stn T. Cook_