IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

THE WALL GUY, INC.,
JEFFREY FRYE, and
JR CONTRACTORS,

              Plaintiffs,

v.                                        CIVIL ACTION NO.   3:20-0304
                                        (consolidated with 3:20-0305)

FEDERAL DEPOSIT INSURANCE
CORPORATION (FDIC) as Receiver for
The First State Bank,

              Defendant.

MEMORANDUM OPINION AND ORDER

        This action and the consolidated companion case, *FDIC v. Frye*, Civ. Act. No. 3:20-305, pose complicated legal issues against a unique procedural backdrop. Plaintiffs The Wall Guy, Inc., Jeffrey Frye, and JR Contractors (collectively referred to as "Borrowers") and Defendant Federal Deposit Insurance Corporation, as Receiver (FDIC-Receiver) for The First State Bank, have filed competing motions pursuant to Rule 59 of the Federal Rules of Civil Procedure, challenging a judgment and remittitur entered by a state trial court that this Court adopted as its own following removal. *See Wall Guy, Inc. v. FDIC*, 3:20-304, 2021 WL 838889 (S.D. W. Va. 2021) (adopting and entering at its own the Cabell County Circuit Court's Order Denying Defendant's Renewed Motion for Judgment as a Matter of Law, Granting, in part, Defendant's Motion for Remittitur or New Trial, and Denying Plaintiffs' Motion to Award Interest on Judgment Pursuant to W. Va. Code 56-6-31). For the following reasons, the Court finds the remittitur was

improper, the jury's verdict was excessive, Borrowers' claim against the FDIC-Receiver is barred, and judgment must be entered in favor of the FDIC-Receiver in case 3:20-0304.

## I.
## FACTUAL AND
## PROCEDURAL BACKROUND

Essential to the resolution of the current motions is the backdrop upon which these consolidated actions rest. Mr. Frye is a businessman who operates JR Contractors, a West Virginia sole proprietorship, and The Wall Guy, Inc., a West Virginia Corporation. Most of Mr. Frye and his companies' ventures involve building large-scale retaining walls. The First State Bank, Inc. (First State) also was a West Virginia corporation that had a long-standing banking relationship with Mr. Frye and his companies. However, when the relationship between Borrowers and First State fell apart, these actions ensued.

On January 15, 2016, The Wall Guy, Inc. filed an action against First State, alleging, inter alia, that Jackie Cantley, a bank executive, illegally added amounts to loan accounts that were never disbursed to it. *The Wall Guy, Inc. v. The First State Bank*, Civ. Act. No. 16-C-027, *sub nom. The Wall Guy, Inc. v. FDIC*, Civ. Act. No. 3:20-0304 (referred to hereinafter as "Case One"), *Compl.* ¶¶16, 24, ECF No. 6, at 5-6.[1] After Mr. Cantley and First State parted ways, Plaintiff Frye asserts he met with P. Andrew Vallandingham, another bank officer, who "pressured [him] into signing over nearly $500,000 of construction equipment" and pledging certain property

---

[1]Mr. Cantley's criminal banking activities are well-known. In 2014, he pled guilty before this Court to Misallocation of Bank Funds, in violation of 18 U.S.C. § 656. *See United States v. Cantley*, 3:13-cr-00245 (S.D. W. Va. 2013). Mr. Cantley was sentenced on September 15, 2014, to sixty months of incarceration. Since that time, there have been several actions filed alleging that Mr. Cantley's criminal conduct caused various plaintiffs personal and business losses. This Court also recognizes that his actions were a contributing factor to bank's ultimate failure.

referred to as "Booten Creek" to secure a Business Loan Agreement in the amount of $280,000, often referred to as the "Consolidation Loan." *Id*. ¶¶17-20; *see Business Loan Agreement* (Dec. 13, 2012), ECF No. 6-1, at 52-56; Errors and Admissions Agreement (Dec. 13, 2012), ECF No. 6-1, at 57-58; *Promissory Note* (Dec. 13, 2012), ECF No. 6-1, at 50-51; *Deed of Trust* (Dec. 13, 2012), ECF No. 6, at 11-17;[2] *Agricultural Security Agreement* (describing equipment used as collateral) (Dec. 13, 2012), ECF No. 6-1, at 59-63. The Deed of Trust for Booten Creek was made amongst Mr. Frye for The Wall Guy, Inc. and Mr. Frye as Guarantor and First State, as Lender, and P. Andrew Vallandingham and Samuel Vallandingham, as "Trustee," and recorded at that Cabell County courthouse on January 22, 2013. *Deed of Trust*, at 1. The Business Loan Agreement for $280,000, the Errors and Omissions Agreement, and the Promissory Note were all made between Mr. Frye and First State. The Agricultural Security Agreement provides it was made between the Wall Guy, Inc. and First State. The $280,000 Business Loan Agreement, the Errors and Omissions Agreement, the Promissory Note, the Deed of Trust, and the Agricultural Security Agreement all bear Jeffrey Frye's name,[3] but none were signed by the bank.

At some point, it appears that Mr. Frye began having financial difficulty, which resulted in him filing Chapter 13 bankruptcy in 2014. *In Re: Jeffrey Allen Frye,* 3:14-bk-30113 (S.D. W. Va. 2014). Thereafter, in or about December of 2015, The Wall Guy, Inc., which was not in bankruptcy, received a Notice of Trustee Sale of the Booten Creek property scheduled for

---

[2] The Deed of Trust was attached as Exhibit 1 to the Complaint.

[3] Mr. Frye reportedly told his banking expert that "[t]here were loan amounts and documents that [he] did not recall. Further, Mr. Frye questioned some of the signatures that were supposed to be his signature." *Affid. of Jason D. Koontz* ¶8, ECF No. 6, at 19.

January 19, 2016. *Aff. of Jason D. Koontz* ¶¶2, 3,[4] ECF No. 6, at 18. To stop the sale, The Wall

Guy, Inc. filed Case One against First State, seeking both a temporary restraining order and

injunctive relief. Additionally, the Complaint alleged claims for Breach of Fiduciary Duty,

Negligence, and Breach of Contract against First State. *Compl*. ¶¶23-38.[5] Neither Mr. Frye nor JR

Contactors were named as Plaintiffs in Case One when it was filed. It is not clear from the record

whether the state court ever took up the injunction request, but First State proceeded with the

foreclosure and obtained title to Booten Creek on March 24, 2016. *See Mem. of Law in Supp. of*

*Mot. of FDIC to Reconsider and Amend J.*, at 3, ECF No. 20. Nevertheless, the remainder of The

Wall Guy, Inc.'s action continued against First State.

        In the meantime, the bankruptcy court dismissed Mr. Frye's bankruptcy case on

April 15, 2016, on a motion by the bankruptcy court Trustee for "fail[ing] to respond to or

otherwise cure the matters raised in the Trustee's motion to dismiss." *In re: Jeffrey Allen Frye*,

3:14-bk-30113, *Order Dismissing Pet.* (Apr. 15, 2016), ECF 6-1, 28. Soon thereafter, on May 13,

2016, First State filed its own action against Mr. Frye, The Wall Guy, Inc., and the Wall Guy, Inc.

d/b/a JR Contractors to collect on $385,169.35 in loans that were included in the dismissed

bankruptcy case. *See Compl.*, *The First State Bank v. Frye*, Civ. Act. No. 16-C-341, *sub nom FDIC*

*v. Frye*, 3:20-305, ECF No. 6-1, at 23-27 (referred to hereinafter as "Case Two"). First State

alleged Mr. Frye and his companies were in default, but they refused to assist in the peaceful

---

[4]Mr. Koontz's affidavit was attached as Exhibit 2 to the Complaint.

[5]The Wall Guy, Inc. moved to amend its Complaint in Civ. Act. No. 16-C-027 on December 11, 2017 to state claims for (1) Breach of Express Warranty and (2) Fraud and Breach of Fiduciary Duty. *Mot. to Amend* (Dec. 11, 2017), ECF No. 6, at 105-09. The state court denied the motion as untimely. *See Order*, Civ. Act. No. 16-C-27 (Jan. 23, 2018), ECF No. 6, at 122-23.

repossession of the collateral used to secure the loans. *Id*. Therefore, First State sought an injunction to execute the orderly repossession of the collateral. *Id*. ¶9.

Shortly thereafter, the state court entered an Order in Case Two finding Mr. Frye, The Wall Guy, Inc., and JR Contractors had defaulted on various loans in the amount of $385,169.35. *Order*, Civ. Act. No. 16-C-341 (May 27, 2016), ECF No. 6-1, at 41-44. The state court also found that Mr. Frye, The Wall Guy, Inc., and JR Contractors had no equity in the collateral securing those loans and that they had refused a peaceful repossession of the same. *Id*. Therefore, the state court directed that the collateral be peacefully surrendered to First State. *Id*.

There was no further substantive activity in Case Two. However, on August 4, 2018, The Wall Guy, Inc., Jeffrey Frye, and The Wall Guy, Inc. d/b/a/ JR Contractors as "Plaintiff/Counterclaim Defendants"[6] filed a motion in Case One to set aside the Order in Case Two under Rule 60(b) of the West Virginia Rules of Civil Procedure.[7] The state court in Case One denied the motion, finding (1) it was untimely because the May 2016 Order had remained unchallenged for over two years, (2) the allegation First State did not fund or credit loan proceeds in the amount of $151,718.96 was not "newly discovered evidence" but, rather, based on records admittedly produced over a year earlier, and (3) no exceptional circumstances existed warranting setting the Order aside. *Order*, Civ. Act. No. 16-C-27 (Aug. 22, 2018); 3:20-304, ECF No. 6-5, at

---

[6]Although Mr. Frye and JR Contractors frequently appear in the style of Case One, the style was not officially changed to include them as "Plaintiffs" until August 20, 2018. *See Agreed Order Substituting Plaintiffs* (Aug. 20, 2018), ECF No. 6-5, at 24-26.

[7]*Mot. to Set Aside the Order from May 27th, 2016 Pursuant to Rule 60(b) of the R. of Civ. Proc.*, Civ. Act. No. 16-C-027 (Aug. 6, 2018), ECF No. 6-3, at 1-6. It does not appear from the state court's docket sheet that this motion was ever filed in Case Two.

9-13. As a result, the state court also granted First State's Motion in Limine in Case One collaterally estopping any challenge to the earlier finding that the loans in Case Two were in default and/or suggesting that First State wrongfully repossessed the collateral at issue in Case Two. *Order*, Civ. Act. No. 16-C-27 (Aug. 21, 2018), ECF No. 6-4, at 101-05. Additionally, the state court excluded in Case One any evidence that the foreclosure and repossession in Case Two resulted in any damages. *Id.*, at 103.

Prior to the trial in Case One, the state court granted First State's Motion for Summary Judgment on the Breach of Fiduciary Duty and Negligence claims. *Order*, Civ. Act. No. 16-C-27 (Aug. 22, 2018), ECF No. 6-5 at 14-19. Thus, the only remaining claim for trial was the Breach of Contract claim. This claim focused on two separate loans: the Consolidation Loan for $280,000 and a separate SBA loan in the amount of $230,000. At trial, Borrowers offered a copy of the Note for the SBA loan, an Unconditional Guarantee for the loan, an Errors and Omissions Agreement, a Commercial Security Agreement, and an Equal Credit Opportunity Notice. However, as with the Consolidation Loan, First State did not sign any of these documents. ECF No. 42-6, at 20-37. Following a three-day trial, the jury returned a verdict finding First State had breached both loans and awarded The Wall Guy, Inc., Mr. Frye, and JR Contractors a lump-sum of $1,500,000. *Verdict Form*, at 1-3 (Aug. 23, 2018), ECF No. 6-5, at 31-33.

On September 14, 2018, First State filed a Renewed Motion for Judgment Notwithstanding the Verdict, Remittitur, or a New Trial. ECF No. 6-5, at 69-97. On March 14, 2019, the state court entered an Order rejecting First State's argument that, under *Jones v. Kessler*, 126 S.E. 344 (W. Va. 1925), Borrowers could not recover monetary damages on either contract

because they breached the contracts by not making their loan payments. *Order Den. Def.'s Renewed Mot. for JNOV, Granting, in part, Def.'s Mot. for Remittitur or New Trial, and Den. Pls.' Mot. to Award Interest on J. pursuant to W. Va. Code 56-6-31*, ECF No. 7, at 50-64. Upon consideration, the state court distinguished *Jones* by finding the plaintiff in *Jones* had breached first. To the contrary, the state court found the evidence in Case One established that First State breached first, causing Borrowers to suffer damages, resulting in Borrowers' default. *Id*. ¶¶7-10.

In its Order, the state court also rejected First State's argument that it fully funded the $280,000 Consolidation Loan and any breach of contract it committed "occurred under an earlier loan which was subject to the doctrine of novation." *Id*. ¶11. First State argued the Consolidation Loan was created to pay off and pay down earlier loans, pay a tax lien, and provide working capital. *Id*. ¶14. However, the state court found First State failed to establish the elements of novation. *Id*. ¶16.

On the other hand, First State effectively argued that the $1,500,000 verdict was excessive by including compensation for amounts that were not legally recoverable. First, Borrowers presented evidence to the jury that their attorney fees and costs totaled $102,500, and the state court found it erred in refusing to instruct the jury that attorney fees and costs were not recoverable as part of any award. *Id*. ¶¶32, 35, 36. Although the state court stated "[t]here is no data by which the amount of fees and costs awarded by the jury can be definitely ascertained," the state court deducted that amount from the $1,500,000 verdict. *Id*. ¶¶35, 38.

Second, the state court found that Borrowers presented evidence of the value of the repossessed collateral in violation of the court's pretrial ruling precluding such evidence. *Id.* ¶48. As Borrowers presented testimony that the value of the repossessed collateral was $873,477, the court also deducted that amount from the verdict, leaving a balance of $524,023. *Id.* ¶¶49-53.[8] The state court then rejected the remainder of First State's arguments and entered judgment in the remittitur amount of $524,023. *Id.* ¶61.[9] Thereafter, the state court gave Borrowers the option of accepting the remittitur, requesting a new trial, or filing an appeal. Borrowers elected to appeal.

To secure the judgment while Case One was on appeal, First State and Borrowers entered into a Pledge Agreement. *Pledge Agreement*, ECF No. 7, at 75-78. First State also filed a motion to stay enforcement of the judgment. ECF No. 7, at 65-66. The lower court granted the motion, staying the matter pending a ruling by the West Virginia Supreme Court. *Order Granting Def.'s Mot. for Stay of Proceedings to Enforce J.* (June 3, 2019), ECF No. 7-2, at 81-83.

While the appeal was pending, however, the bank failed, and the FDIC was appointed as Receiver on April 3, 2020, succeeding to the bank's interests and liabilities. *See* 12 U.S.C. § 1821(d)(2)(A), in part ("The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to—(i) all rights, titles, powers, and privileges of the insured depository institution"). The FDIC-Receiver substituted itself for First State in both Cases One and Two and removed the actions to this Court on April 30, 2020. *See* 12 U.S.C. § 1819(b)(2) (providing for the

---

[8]In doing so, the state court repeated that "[t]here is no data by which the amount of fees and costs awarded by the jury can be definitely ascertained[.]" *Id*. ¶50.

[9]The state court also rejected Borrowers' motion for pre-judgment interest. *Id.* ¶67.

removal to federal court by the FDIC).[10] The FDIC-Receiver then moved to consolidate the actions and stay all judicial proceedings to allow Borrowers to complete the mandatory administrative claims process set forth in 12 U.S.C. § 1821(d) of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). This Court granted the motions. *Order Granting Def. FDIC-Receiver's Mot. for a Stay of all Judicial Proceedings* (May 27, 2020), ECF No. 10.

Ultimately, Borrowers' claims were administratively denied, and the Court lifted the stay. Borrowers then filed a Motion for Summary Judgment (ECF No. 15) and a Motion to Enforce Judgment in the amount of $1,500,000. ECF No. 23. The FDIC-Receiver also filed a Motion to Reconsider and Amend Judgment. ECF No. 19.

Before addressing the underlying merits of the parties' motions, the Court found it necessary to address the unique procedural posture of this case. Pursuant to the Fourth Circuit's decision in *Resolution Trust Corp. v. Allen*, 16 F.3d 568 (4th Cir. 1994), the Court was required first to "'adopt the state court judgment as its own'" and then treat the judgment "the same as other judgments entered by the district court, [with] . . . the parties . . . follow[ing] the ordinary rules regarding post-judgment remedies.'" *The Wall Guy, Inc.*, 2021 WL 838889, at *3 (quoting *Resolution Trust Corp.,* 16 F.3d at 573). Thus, after the Court adopted the state court's judgment, the parties may file post-trial motions or appeal to the Fourth Circuit. *Id.* If the parties elect to file post-trial motions, the district court should address the motions on the merits, which allows the

---

[10]Although Case One was pending before the West Virginia Supreme Court, Case Two remained stayed in the trial court pending the outcome of Case One on appeal. *See Order*, Civ. Act. No. 16-C-341 (June 3, 2019), ECF No. 1-5, at 28-30.

district court to "'consider any new federal questions injected into the case by the addition of RTC [or in this case, the FDIC], and require whatever  briefing, argument or hearings it deems necessary to resolve these questions and prepare an adequate record for review on appeal.'" *Id.* (quoting *Resolution Trust Corp.*, 16 F.3d at 573). This procedure prevents the Fourth Circuit "'from assuming the role of a state appellate court.'" *Id.* (quoting *Resolution Trust Corp.*, 16 F.3d at 573). Therefore, the Court adopted and entered as its own the state court's remittitur order in Case One. *Id.*

Although the Court recognized that ordinarily the parties would then be given the opportunity to file post-trial motions, this action presented yet another complication because the state court already had ruled on the post-trial motions and the district court must "'take[] the case as it finds it . . . and treat[] everything that occurred in the state court as if it had taken place in federal court.'" *Id.* (quoting *Khouri v. Nat'l Gen. Ins. Mktg., Inc.*, No. 1:20-cv-580, 2020 WL 6749713, at *2 (M.D. N.C. Nov. 17, 2020) (internal quotation marks and citations omitted)). In other words, by adopting the state court judgment, this Court also adopted the state court's rulings on the post-trial motions. *Id.*

By readopting the state court's remittitur, the parties agreed that Borrowers then "must be given the option of either accepting the reduction in the verdict or electing a new trial.'" *Id.* at *4 (quoting Syl. Pt. 9, *Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815 (W. Va. 2010); also citing *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998)). Therefore, the Court directed Borrowers to make its choice, and it denied the remainder of the parties' pending motions. *Id.*

On March 8, 2021, Borrowers accepted the remittitur, and the Court entered a Judgment Order against the FDIC-Receiver in the amount of $524,023. ECF Nos. 37, 38. The FDIC-Receiver then filed a Motion to Amend this Court's Judgment Reflecting the State Court's Remittitur Order and Grant Judgment to the FDIC-Receiver or, Alternatively, to Order a New Trial. ECF No. 42. On the same day, the FDIC also filed a Notice of Appeal to the Fourth Circuit. Four days later, Borrowers filed their own Rule 59(e) motion, seeking an award of the entire $1,500,000 jury verdict or, in the alternative $1,396,501, which reflects the remittitur amount of $523,024 plus the value of the repossessed items in the amount of $873,477. ECF No. 47. On that same day, Borrowers also filed a Notice of Appeal. ECF No. 49. Thereafter, the Fourth Circuit entered a Jurisdictional Notice suspending any proceedings until this Court ruled on the pending Rule 59 motions. ECF No. 53.

Following extensive briefing on the pending motions, the FDIC-Receiver filed an Emergency Motion to Enforce the Parties' Pledge Agreement. ECF No. 71. When First State failed, three of the four properties used as collateral to secure the judgment were transferred to MVB Bank (MVB). *The Wall Guy, Inc. v. FDIC*, Civ. Act. No. 3:20-304, 2022 WL 17072028, *1 (S.D. W. Va. Nov. 17, 2022). MVB then sold two of the properties. *Id.* As the Pledge Agreement created a cloud of title on the properties, the FDIC-Receiver sought to substitute the property used as collateral for a letter of credit in the amount of the remittitur. *Id.* Although Borrowers vehemently objected and asserted First State agreed to collateralize $2,300,000 worth of claims, the Court found the Pledge Agreement allowed for the property to be sold and for the FDIC-Receiver to offer substitute collateral in the amount of the remittitur. *Id.* at *2. Therefore, the Court

granted the FDIC-Receiver's motion. *Id.* Now, the only remaining issues for the Court to address are the parties' post-trial cross motions under Rule 59.

## II.
## STANDARD OF REVIEW

The FDIC-Receiver and Borrowers both filed their motions to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Although Rule 59(e) does not contain its own standard, the Fourth Circuit has held there are three grounds upon which a Rule 59(e) motion may be granted. These are "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co*., 148 F.3d 396, 403 (4th Cir. 1998) (citations omitted). Rule 59(e), however, "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (internal quotation marks and citation omitted). Additionally, a Rule 59(e) motion "is an extraordinary remedy that should be applied sparingly." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc*., 674 F.3d 369, 378 (4th Cir. 2012) (citation omitted).


Alternatively, the FDIC-Receiver also seeks a new trial under federal Rule 59(b). With respect to this argument, the Court looks to Rule 59(a)(1)(A), which provides the criteria for granting a new trial following a jury trial. Rule 59(a)(1)(A) provides "the court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Fourth Circuit has explained that, under the Rule, the district court must "set aside the verdict and grant a new trial, if he is of the opinion that [1] the

verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (internal quotation marks and citations omitted). Additionally, when considering whether to grant a new trial under Rule 59, "a trial judge may weigh the evidence and consider the credibility of the witnesses[.]" *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989) (citations omitted). It is in light of these principles that the Court now considers the parties' arguments.

### III.
### DISUSSION

### A.
### Authority of the Court to
### Rule on the Parties' Motions

Before addressing the merits of the Rule 59 motions, however, the Court first must determine its authority to do so under the circumstances of this case. On one hand, as this Court stated in its March 2021 Memorandum Opinion and Order, the Court already ostensibly has ruled on post-trial motions by adopting as its own the state court's remittitur order and treating everything that took place in state court as if it had occurred before this Court. *The Wall Guy, Inc.*, 2021 WL 838889, at *2-3. On the other hand, the Judgment Order entered by this Court is distinguishable from the Judgment Order entered by the state court in one important, critical way. The Judgment Order entered by this Court is no longer against First State. Rather, it is against the FDIC-Receiver. As such, the FDIC-Receiver has unique arguments and statutory defenses available to it under federal law that were not available to First State. Additionally, it is clear from the Fourth Circuit's decision in *Resolution Trust Corp.* that it is this Court's obligation to consider and address the merits of any new federal questions raised by the FDIC-Receiver so there is an

adequate record for review. *See Resolution Trust Corp.*, 16 F.3d at 573. Therefore, the Court finds it has the authority and, indeed, the obligation to rule on the parties' motions.

**B.**
**Challenges to the Remittitur**
**and the Jury Verdict**

In their motions, both parties argue that the Court should reconsider the remittitur to prevent a clear error of law and to prevent a manifest injustice under Rule 59(e). The FDIC-Receiver also asserts the jury's verdict was excessive, against the clear weight of the evidence, and based upon false evidence. Specifically, the FDIC-Receiver asserts the only evidence of damages at trial was Mr. Frye's testimony that: (1) First State failed to fund $125,000 in loan proceeds;[11] (2) he lost $43,000 annually when First State repossessed the equipment; (3) he spent $105,000 in legal fees and costs; and (4) the value of the collateral seized was $873,477.[12] Not only does the FDIC-Receiver contend much of this evidence is demonstrably false, it also argues the value of the collateral seized or foreclosed upon, together with any damages Borrowers suffered as a result of the seizure, was inadmissible under the state court's pretrial ruling collaterally estopping them from challenging the earlier ruling in Case Two. *See Order*, Civ. Act. No. 16-C-27, ECF No. 6-4 at 101-05. Moreover, the FDIC-Receiver agrees with the state court that the jury should have been instructed that it could not award attorney fees and costs. For their part, Borrowers generally insist the remittitur was unjustified and the jury's calculation of damages should be reinstated.[13]

---

[11] Of the $125,000 Borrowers claimed was missing, the FDIC-Receiver asserts the evidence at trial proved that all but $5,125 actually was disbursed to Borrowers or used to payoff other loans.

[12] The FDIC-Receiver argues this figure is unsupported in the record. Borrowers claim it represents both the collateral listed in the bankruptcy proceedings and the collateral possessed by the Wall Guy, Inc., which was not part of the bankruptcy proceedings.

[13] Borrowers also claim the Court should award them an additional $2,300,000 to

Upon consideration, the Court has no difficulty finding, as did the state court, that the jury verdict was excessive. Borrowers submitted evidence that First State failed to fund $125,000 in loan proceeds. Thus, the $1,500,000 verdict almost certainly included damages that were presented to the jury, but that were not recoverable, i.e., the value of the repossessed collateral and attorney fees and costs.[14] Clearly, the state court believed these items were improperly considered and deducted them from the verdict, leaving a remittitur balance of $524,023. However, even if this Court assumes these deductions were appropriate, there remains a difference of $399,023 between the amount of the remittitur and the $125,000 claim of missing funds. Each side attempts to explain what they believe the jury considered in calculating the verdict, but both sides' assumptions encompass a hefty dose of speculation. Even the state court acknowledged twice in deciding the amount of the remittitur that "[t]here is no data by which the amount of fees and costs awarded by the jury can be definitely ascertained[.]" *Order Den. Def.'s Renewed Mot. for JNOV, Granting, in part, Def.'s Mot. for Remittitur or New Trial, and Den. Pls.' Mot. to Award Interest on J. pursuant to W. Va. Code 56-6-31* ¶¶36, 50, ECF No. 7, at 57, 59. Given the uncertainty of how to reduce the verdict, this Court finds that any recalculation would amount to mere guesswork. Quite simply, there is no way for this Court to justly reduce the excessive verdict in fairness to either party. Thus, in addition to finding the jury's original verdict was excessive and against the weight of the evidence, the Court also finds it must reverse the entry of the remittitur to prevent a manifest injustice. *See Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 336 (W. Va. 2021) (holding that, to the extent a lump-sum jury award may contain unrecoverable damages and apportionment

---

compensate them for the value of the collateral listed in the Pledge Agreement. However, this Court ruled in its November 2022 Memorandum Opinion and Order that the sale of the collateral was consistent with the terms of the Agreement. *The Wall Guy, Inc.*, 2022 WL 17072028, at *2.

[14]Mr. Frye also offered evidence of loss of income caused by the repossession.

of damages is subject to speculation, the award is found to be against the clear weight of the evidence and will be reversed and remanded for a new trial on damages).

## C.
### The FDIC-Receiver's Protection
### under FIRREA

Ordinarily, the next step would be for this Court to direct a retrial.[15]  However, the FDIC-Receiver further argues that Borrowers cannot maintain an action against it because Congress has bestowed upon it special protections under FIRREA that extinguish Borrowers' breach of contract claim. Specifically, the FDIC-Receiver cites 12 U.S.C. §§ 1823(e) and 1821(d)(9)(A) as barring Borrowers' claim.[16]  Section 1823(e)(1) provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

---

[15]For the reasons stated *infra*, the Court need not decide whether a retrial would be on liability or just damages.

[16]The FDIC-Receiver also cites 12 U.S.C. § 1825(b), barring punitive damages against it. The FDIC-Receiver argues that the jury verdict likely contained punitive damages. However, as the Court already ruled the damages awarded by the jury cannot stand, the issue of whether the verdict contained punitive damages is moot.

> (D) has been, continuously, from the time of its
> execution, an official record of the depository
> institution.

12 U.S.C. § 1823(e)(1)(A)-(D). In *Resolution Trust Corp.*, the Fourth Circuit held that "[a]ll four of these requirements must be satisfied for an agreement to be enforceable against [the FDIC-Receiver]." 16 F.3d at 574. Additionally, § 1821(d)(9)(A) states that, "[e]xcept as provided in subparagraph (B), any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the [FDIC-Receiver]." 12 U.S.C. § 1821(d)(9)(A).[17] Moreover, "[e]nforcement of agreements which must be inferred from written recorded agreements is forbidden . . . ; explicit written documentation is required[.]" *Resolution Trust Corp.*, 16 F.3d at 575.

Here, the FDIC-Receiver points out that Borrowers never identified any agreement *executed* by First State that is enforceable against the FDIC-Receiver under § 1823(e)(1). As to the $280,000 Business Loan Agreement and the related Errors and Omissions Agreement, Promissory Note, Deed of Trust, and Agricultural Security Agreement, none of the documents offered were signed by an official at the bank. Likewise, there is no signature by a First State representative on the $230,000 SBA Note or the related Unconditional Guarantee, Errors and Omissions Agreement, Commercial Security Agreement, and Equal Credit Opportunity Notice. Moreover, in any event, the FDIC-Receiver argues that Borrowers have not identified a single provision in any of these documents that creates an enforceable obligation by which First State was required to advance to Borrowers any sums impermissibly added to the loan balances.[18] If

---

[17]Subsection (B) involves an exception that is not relevant to this case.

[18]The FDIC-Receiver asserts the only document submitted into evidence at trial that

such sums were added to loans, but not actually disbursed to Borrowers, the FDIC-Receiver insists the remedy is for Borrowers not to repay the non-disbursed amount. If, as here, the non-disbursed amount is awarded as damages without any obligation to repay, the FDIC-Receiver contends it results in an improper windfall to Borrowers. Additionally, to the extent it is even arguable there was an implied obligation under any of the loan agreements to advance the "missing" funds, the FDIC-Receiver maintains Congress prohibits consideration of it under FIRREA as all terms must be expressly reflected in a signed written agreement between the bank and the Borrowers and made part of the bank's records.

In Response, Borrowers argue they introduced a number of documents regarding the loans at trial, the parties stipulated at trial that the contracts existed, and the FDIC-Receiver is bound by that stipulation because it stepped into the shoes of First State when it was named Receiver. However, the FDIC-Receiver's arguments are more nuanced than simply whether the contracts exist. Rather, it is that, even if contracts existed between First State and Borrowers, those contracts are not enforceable against it because they do not comply with FIRREA's requirements. Specifically, the purported contracts were not signed by First State, as required by FIRREA, and, at best, any breach must be implied from the existing documents, which also is prohibited under FIRREA. Upon review, the Court agrees with the FDIC-Receiver that Congress has foreclosed Borrowers' breach of contract claim.

---

addressed First State's duties was the Business Loan Agreement related but, in addition to being unsigned, it does not contain a provision obliging the bank to advance the loan in full.

Although the Fourth Circuit has not extensively addressed § 1823(e) in many years, the Court finds the Eleventh Circuit's recent discussion in *Landcastle Acquisition Corp. v. Renasant Bank*, No. 20-13735, 2023 WL 174277 (11th Cir. 2023), and its predecessors, helpful. In *Landcastle Acquisition Corp.*, the Eleventh Circuit explained that § 1823(e) broadened the protections afforded the FDIC following the United States Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942). 2023 WL 174277, at *1, 6. Section 1823(e) and *D'Oench*, collectively referred to as the "*D'Oench* doctrine," allow the FDIC-Receiver to "rely upon the *failed bank's official records* when it quickly estimates and sells a failed bank's assets—loans and collaterals—to a successor bank that takes over the failed bank's deposit liabilities." *Id.* at *1, 2 (italics original).[19] This process permits the successor bank to reopen immediately without interruption to customers. *Id.* at *2 (citing *Langley v. FDIC*, 484 U.S. 86, 91–92 (1987); *Fed. Sav. & Loan Ins. Corp. v. Gordy*, 928 F.2d 1558, 1564 (11th Cir. 1991)). To accomplish its goals, "*D'Oench* affords the FDIC a super-charged, holder-in-due-course protection." *Id.* Additionally, any "agreement—that 'tends to diminish or defeat' the FDIC's interest in an asset—is only valid against the FDIC if it [satisfies all the requirements of § 1823(e)]." *Id.* at *6 (citation omitted). To be clear, "the equities that the *D'Oench* doctrine regards as predominant are those protecting the FDIC." *Id.* *19 (citing *Langley*, 484 U.S. at 94-95).

---

[19]In *Young v. FDIC.*, 103 F.3d 1180 (4th Cir. 1997), the Fourth Circuit explained the relationship between *D'Oench* and § 1823(e) slightly differently. The Fourth Circuit stated that the statute "essentially encompasses the principles of the common-law *D'Oench* doctrine[, but it] . . . does not . . . preempt the *D'Oench* doctrine." 103 F.3d at 1187. Thus, although the statute and *D'Oench* are often construed together, "the common-law doctrine and the statute remain separate and independent grounds for decision." *Id.* (citations omitted).

In explaining the reach of the *D'Oench* doctrine, the Eleventh Circuit cited one of its earlier decision in *Twin Construction, Inc. v. Boca Raton, Inc.*, 925 F.2d 378 (11th Cir. 1991). As relevant here, the Eleventh Circuit held in *Twin Construction* that "a document in the failed bank's records is not enough to bring a party's claim outside of *D'Oench* protection *unless* the document was *executed* by the failed bank." *Id.* at *10 (italics added to the word "executed") (citing *Twin Constr.*, 925 F.2d at 382-84). The Eleventh Circuit defined the term "executed" in the context of § 1823(e) as meaning that the bank "signed" the agreement at issue. *Twin Constr.*, 925 F.2d at 384. "Where only a single party has signed a document, that document itself does not establish that the non-signatory is required to perform any obligations contained in the document." *Id.* Moreover, while it may be permissible in a typical contract case to assess whether a non-signatory's words or actions bound it to an agreement, such an assessment is not permitted under *D'Oench* and § 1823(e) as the agreement must be signed to be enforceable against the FDIC-Receiver. *Id.* Additionally, the "'doctrine applies even where the customer is completely innocent of any bad faith, recklessness, or negligence.'" *Landcastle Acquisition Corp.*, at *11 (quoting *Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 150, 1515 (11th Cir. 1991)). Lastly, as stated by the district court in the Southern District of Georgia, "[t]he burden of establishing that an agreement satisfies § 1823(e)(1)'s requirements lays with the party claiming the adverse interest." *Lindley v. FDIC*, No. 4:11-cv-147, 2012 WL 27576, at *3 (S.D. Ga. Jan. 4, 2012) (citations omitted).

Applying these principles to this case, Borrowers find themselves in an untenable position. Despite a sizable jury award, First State collapsed while the case was on appeal. Unfortunately for Borrowers, the bank's collapse ushered in a new set of federal rules, affording

the FDIC-Receiver protections under § 1823(e) that First State did not have when the case was tried. Specifically, as Borrowers' only claim is for a breach of contract, they have the burden to establish that an authorized representative of First State signed the contracts they assert were breached. Therefore, regardless of the parties' additional disputes over the merits of the underlying breach of contact claim against First State itself,[20] Borrowers now are statutorily required to produce an *executed* contract by First State.

Here, likely due to First State's haphazard procedures, lack of controls, and overall ineptness that ultimately led to its demise, no one from the bank ever signed the loan documents at issue.[21] However, this Court has no authority to waive the requirements Congress has established in § 1823(e), and Congress has made it clear that "any agreement which does not meet the requirements set forth in section 1823(e) . . . shall not form the basis of, or substantially comprise, a claim against the receiver or the [FDIC]." 12 U.S.C. § 1821(d)(9)(A). Thus, as the contracts alleged to have been breached were not signed by anyone at First State, § 1823(e) unequivocally bars the claim against the FDIC-Receiver. Moreover, as argued by the FDIC-

---

[20]The FDIC-Receiver further argues there were several trial errors that warrant a JNOV. Borrowers dispute those arguments and point to the fact that First State never objected at trial to several of the alleged errors and, therefore, they were waived. The FDIC-Receiver also insists the state court erred by ruling that First State breached the contracts before Borrowers breached. Thus, the FDIC-Receiver asserts Borrowers' claim cannot survive under West Virginia law. *See Jones v. Kessler*, 126 S.E. at 350 (stating "a plaintiff has no right of action for damages for breach of contract, where he himself has breached the contract" (citation omitted)). However, for the reasons stated *infra*, this Court need not sift through all the alleged trial errors and the relative timing of who breached first because Borrowers' claim cannot survive under § 1823(e).

[21]Borrowers make a cursory statement that they do not believe First State provided them with complete discovery. However, the time to address discovery issues was during the discovery phase prior to trial, and this Court will not entertain reopening discovery at this point in the proceedings.

Receiver, Borrowers have not pointed to any specific written provision within those documents regarding an obligation by First State to advance any "missing" funds. As § 1823(e) requires the agreement to be in writing, any words, actions, or implied agreements that may have bound First State to such an obligation are not enforceable against the FDIC-Receiver.

In a last ditch effort, Borrowers argue they are exempt from § 1823(e)'s requirements because the Pledge Agreement they entered into with First State in lieu of an appellate bond is a "qualified financial contract" (QFC) and falls within an exception in § 1823(e)(2). *See Pls.' Reply to FDIC-Receiver's Resp. in Opposition to Motion to Amend. J.*, at 5, ECF No. 58. However, the Pledge Agreement clearly does not meet the definition of a QFC under the statute. *See* 12 U.S.C.A. § 1821(e)(8)(D)(i) (providing "[t]he term 'qualified financial contract' means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement that the Corporation determines by regulation, resolution, or order to be a qualified financial contract for purposes of this paragraph"). Moreover, even if the Pledge Agreement was a QFC, it is unclear to the Court how an obligation in lieu of an appellate bond somehow saves the deficiencies in the underlying breach of contract claim. Therefore, the Court denies Borrowers' argument.

**IV.**
**CONCLUSION**

Accordingly, for the reasons stated above, the Court finds that the remittitur was improper, the jury's verdict was excessive, and The Wall Guy, Inc., Jeffrey Frye, and JR Contractors' breach of contract claim is not enforceable against the FDIC-Receiver. Therefore, the Court **DENIES** Borrowers' Motion to Alter and/or Amend the Court's Judgment Reflecting the Remittitur Order and Grant an Enhanced and Larger Judgment. ECF No. 47. On the other hand,

-22-

the Court **GRANTS** the FDIC-Receiver's motion to the extent it moves to Amend this Court's Judgment Reflecting the State Court's Remittitur Order and moves for judgment in its favor, but **DENIES** the same to the extent the FDIC-Receiver alternatively moves for a new trial. ECF No. 42. To ensure the record is complete, the Court further **GRANTS** Borrowers' pending Motion to Supplement the Record. ECF No. 70.

Additionally, the Court recognizes that this Memorandum Opinion and Order primarily resolves Case One (3:20-304), and it is unclear whether the FDIC-Receiver seeks any further relief in Case Two (3:20-305). As these cases are consolidated, the Court **DIRECTS** the FDIC-Receiver to file a report with the Court **on or before February 13, 2023,** addressing whether it intends to proceed with Case Two and, if so, what issues it believes are left to be resolved. Additionally, the FDIC-Receiver seems to concede in its briefing that the trial evidence shows $5,125 was never advanced to Borrowers. Thus, the Court **ORDERS** the FDIC-Receiver to address whether it intends to credit that amount to Borrowers' loans or believes that amount also is not recoverable. The Court **DIRECTS** Borrowers to file a Response, if any, **on before February 17, 2023**. Prior to any filings, the Court further encourages the parties to discuss the issues amongst themselves and determine whether they can reach a mutual agreement. In the meantime, the Court will **HOLD IN ABEYANCE** entry of a final judgment order in favor of the FDIC-Receiver in Case One until the status of Case Two can be determined.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        February 7, 2023

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE